MEMORANDUM OPINION


No. 04-03-00292-CV


RIO GRANDE CITY CONSOLIDATED INDEPENDENT SCHOOL DISTRICT

 and Rio Grande City Public Facilities Corp.,

Appellants


v.


STEPHENS, INC. and First Southwest Company,

Appellees


From the 381st Judicial District Court, Starr County, Texas

Trial Court No. DC-00-89

Honorable John A. Pope, III, Judge Presiding


Opinion by: Sandee Bryan Marion, Justice

 

Sitting: Alma L. López, Chief Justice

 Karen Angelini, Justice

 Sandee Bryan Marion, Justice


Delivered and Filed: April 14, 2004


AFFIRMED



 This is an appeal from a directed verdict in favor of appellees Stephens, Inc. and First
Southwest Company ("First Southwest") (collectively, "defendants"). The underlying lawsuit was
brought by the appellants Rio Grande City Consolidated Independent School District and Rio Grande
City Public Facilities Corp. (collectively, "plaintiffs") for damages arising from defendants' alleged
failure to obtain the best or lowest interest rate on bonds used to finance the construction of a new
high school in Rio Grande City. We affirm.

FACTUAL BACKGROUND

 Rio Grande City Consolidated Independent School District is a public school district in Starr
County, Texas. Rio Grande City Public Facilities Corporation was formed to issue bonds for the
purpose of building a new high school in Rio Grande City. Defendants underwrote the bonds.

 In January 1995, plaintiffs met with representatives of Stephens, Inc. about the bond issuance.
 At this meeting, Stephens, Inc. representatives allegedly said they could obtain the "best rate
possible" on the bonds. No specific rates were promised, only the best rates. This promise was
allegedly repeated at a later meeting between Stephens, Inc. representatives and school board
members. During the 1995 meetings, the parties discussed various financing options, including the
use of lease revenue bonds, a relatively new concept in Texas. The use of these bonds involved
forming a public facilities corporation that would finance the building project through bonds secured
by "Tier 2" funding. (1) The school district would then enter into a lease/purchase agreement with the
public facilities corporation and pay rent to the corporation, which rent in turn serviced the bonds.
As a result of these meetings, the school district decided to utilize the lease revenue bonds, and it
retained Stephens, Inc. as the lead underwriter of the bonds. First Southwest agreed to act as co-manager for the bond offering. A bond purchase agreement was signed on July 18, 1995. The bonds
were priced and sold on July 11, 1995. 

 In September 1998, the new high school flooded, prompting the school board to commission
a comprehensive review of all aspects of the project, including the financing. This review prompted
the school board to suspect that the district had not received the best rates.




PROCEDURAL BACKGROUND In April 2000, the plaintiffs sued the defendants. At trial, plaintiffs asserted that in July 1995
the bonds were sold by defendants at prices that did not result in the best, or lowest, interest rate as
promised. The testimony of plaintiffs' sole expert, Clifton Iverson, Jr., was offered to establish both
liability and damages. After hearing brief testimony from Iverson, the trial court granted defendants'
Robinson motion and defendants' motion for a directed verdict. The trial court granted the
"instructed verdict on the issue of damages alone." On appeal, plaintiffs assert the trial court abused
its discretion in striking Iverson's testimony because he was both qualified to render his opinion and
his opinion was reliable on the issues of liability and damages.

RELIABILITY OF EXPERT TESTIMONY

 To be reliable, the expert's testimony must be grounded in scientific methods and procedure
such that it amounts to more than subjective belief or unsupported speculation. E.I. du Pont de
Nemours & Co. v. Robinson, 923 S.W.2d 549, 557 (Tex. 1995). In Robinson, the Texas Supreme
Court enumerated a list of factors to determine the reliability of expert testimony, including: (1) the
extent to which the theory has or can be tested; (2) the extent to which the technique relies upon
subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and
publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique
has been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial
uses that have been made of the theory or technique. Robinson, 923 S.W.2d at 557. 

 However, in Gammill, the Supreme Court held that the Robinson factors do not always apply
to expert testimony because they do not always fit. Gammill v. Jack Williams Chev., Inc., 972
S.W.2d 713, 726 (Tex. 1998). "Experience alone may provide a sufficient basis for an expert's
testimony in some cases, but it cannot do so in every case." Id. Regardless of whether the Robinson
factors are applied, the proponent of the expert testimony must still prove that the testimony is
reliable. Id. In such a case, the court must consider whether there is too great of an "analytical gap"
between the data and the expert's opinion. Id. The trial court's duty is not to determine whether the
expert's conclusions are correct, but only whether the analysis used to reach them is reliable. Id. at
728. There must be some basis for the opinion offered to show its reliability. Id. at 726.

 On appeal, plaintiffs assert the trial court erred because Iverson was qualified to render his
opinion and his opinion was reliable. Because we conclude Iverson's opinion on damages was not
reliable, we do not address whether he was qualified to render his opinion. (2) Although we also do
not address whether his opinion on liability was reliable, a discussion of Iverson's methodology in
arriving at his conclusion on liability is necessary to a full understanding of his methodology used
in arriving at his opinion on damages.

 Iverson's opinion as to whether plaintiffs received the best rate was based on a comparison
of rates obtained on the Rio Grande bonds and rates achieved on two other school bonds similar to
the Rio Grande bonds. In May 1999, the Donna, Texas school district issued bonds and, in March
1996, the Cleveland, Texas school district did the same. The Rio Grande, Donna, and Cleveland
bonds were all tax-exempt, lease revenue bonds issued to construct school facilities, and all were
underwritten by Stephens, Inc. All were rated BBB-. The Donna bonds were priced on May 2, 1995,
the Rio Grande bonds on July 11, 1995, and the Cleveland bonds on March 28, 1996.

 Iverson examined interest rates generally based on the Bloomberg Index and determined that
rates were declining for various types of bonds during the period from May 2, 1995 to March 28,
1996. According to Iverson, the net interest cost of the Donna bonds was less than the Rio Grande
bonds and, in his opinion, this contradicted the data showing interest rates declining on municipal
bonds. He said he would have expected the net interest cost between the Rio Grande bonds and the
Cleveland bonds to be similar because interest rates did not change between July 11, 1995 and
March 28, 1996. However, when Iverson compared the two, he found the Cleveland bonds to be
cheaper. Iverson concluded that "Rio Grande doesn't seem to fit with Donna in the pattern of falling
rates. When rates are the same it doesn't fit the pattern of Cleveland's. So, what is wrong? I think
what is wrong is the rates being charged Rio Grande."

 Iverson then used the spread between the Bloomberg Index and the three bonds to calculate
damages. Iverson's calculations showed the Donna and Cleveland bonds just above the index, while
the Rio Grande bonds were over three times higher than the index. Based on these calculations,
Iverson concluded Rio Grande paid significantly greater amounts of interest than did the Donna and
Cleveland school districts. Iverson then subtracted twenty-five basis points from the Bloomberg
Index when calculating actual damages to reflect the difference between the school bonds and the
Bloomberg Index bonds. The result was to lower plaintiffs' damage calculations.

 Iverson explained he used twenty-five basis points because the school bond issue was smaller
than other bonds listed in the Bloomberg Index and because a Tier 2 issue was new to the market.
The following exchange with Iverson regarding his use of these basis points occurred during voir
dire:

Q. [by defense counsel] My question is: Have you ever, in this kind of a case,
seen anybody or read about anybody taking Bloomberg and adding 25 points
and use that as a methodology?


A. The only case that I'm aware of, this one.


Q. So the answer would be: You came up with it?


A. Yes, but I have seen other similar cases.


Q. As a matter of fact, in regard to that 25 basis points, you recall that I asked
you in your deposition how did you come up with the 25, and you said that
you split it up between the size of the issue and the newness of the lease.
Right?


A. Newness of the type of issue.


 . . .


Q. And then I asked you: Well, how much of the 25 basis points has to do with
the newness of the issue? You remember what you told me?


A. I think I said 10.


Q. I think you said probably 10. So you didn't even know how your
methodology works? Is that correct?


A. No, I wouldn't say that.


 . . .


Q. Is that right? Up until the time I asked you, you had never even tried to make
a determination about that issue, had you?


A. I had. I had talked to various people.


 . . .


Q. [by the court] Why 25 and not 20 or not 50?


A. Well, all - -


Q. You picked it out of the air?


A. No. If you look at interest rates, okay, between the different categories, you'll
note that the difference between the different categories, you'll note that the
difference between AA and A, for instance, is less than 25 basis point[s],
okay. So I gave credit for an amount that's equal to a whole drop in credit
rate. Okay. And I did it for two reasons. 15 basis points I thought was for the
size of the issue. I've seen - - looked at large issues and small issues, okay.
And that seemed to be reasonable based on the experience I had of observing
those things. And I did ten basis points for the newness of the issue. It was
related to the some [sic] of the issues that we had done when I was in charge
of Westcap.

 Iverson never explained how his experience supported his decision to use twenty-five basis
points, nor did he identify the "similar cases" he had seen or the "various people" to whom he spoke
or how those cases or conversations supported his use of twenty-five basis points. Following voir
dire and plaintiffs' bill of exception, the trial court granted the directed verdict "on the issue of
damages alone." We conclude there is too great of an "analytical gap" between Iverson's
assumptions underlying his use of the twenty-five basis points and the opinion he offered on the
issue of damages; therefore, his opinion on damages was not reliable and amounted to no evidence.
Accordingly, the trial court did not abuse its discretion in granting the directed verdict on the issue
of damages. 




CONCLUSION We affirm the trial court's judgment.


 Sandee Bryan Marion, Justice
1. Funds to pay the rent would come from Tier 2 funds allocated to the school district by the Texas Legislature
as part of the so-called "Robin Hood" school financing plan.
2. Plaintiffs complain that the trial court abused its discretion either by applying Robinson instead of Gammill,
or by misapplying Gammill. The record contains a lengthy discussion about both cases and the standards under each,
which indicates the trial court considered both Robinson and Gammill in reaching its decision. Under either standard,
however, Iverson's testimony was not reliable.