Opinion issued May 22, 2003








     






In The
Court of Appeals
For The
First District of Texas




NO. 01-01-00826-CV




WESTTEX 66 PIPELINE CO., Appellant

V.

MAYLEE O. BALTZELL, INDIVIDUALLY AND AS TRUSTEE OF THE
GEORGE N. JENKS LIVING TRUST; SALLY M. BARBARICH, AS
TRUSTEE OF THE GEORGE N. JENKS LIVING TRUST; EDGAR R.
JENKS, INDIVIDUALLY AND AS TRUSTEE OF THE GEORGE N.
JENKS LIVING TRUST; GEORGE B. JENKS; AND MOLLY E. JONES,
Appellees





On Appeal from the County Court At Law No. 2 and Probate Court 
Brazoria County, Texas
Trial Court Cause No. 24,427G 




MEMORANDUM OPINION

          In this eminent-domain case, WesTTex 66 Pipeline Company (WesTTex)
acquired a 50-foot wide, permanent pipeline easement across the Jenkses’


 property.
Applying the standards enunciated by the Texas Supreme Court in Exxon Pipeline
Co. v. Zwahr,


 we determine whether the trial court abused its discretion in admitting
the opinion testimony of the Jenkses’ two real estate appraisal experts regarding the
value of the property taken. 
          We suggest a remittitur of damages. Conditioned on the suggestion of
remittitur, we affirm the trial court’s judgment.
Factual and Procedural Background
          The Jenkses owned a 735-acre tract of land in Brazoria County. The land had
been owned by the Jenks family since 1906 and was used for agricultural purposes. 
WesTTex desired to construct a 12-inch oil and gas pipeline on the Jenkses’ property. 
After it could not reach an agreement with the Jenkses, WesTTex petitioned the
county court to condemn a 50-foot-wide strip of land on the property for the pipeline. 
The land that WesTTex sought to condemn had a surface area of 5.47 acres. The
county court appointed three special commissioners to determine the value of the land
that WesTTex sought to condemn. Following a hearing, the commissioners awarded
the Jenkses $5,244. On August 28, 1998, WesTTex deposited this amount into the
registry of the court, thereby establishing the date of the taking.


 The Jenkses filed
objections to the commissioner’s award and requested a jury trial. Before trial, the
trial court granted a partial summary judgment confirming WesTTex’s right to
condemn the Jenkses’ land. 
          The pipeline easement obtained by WesTTex contained three previously
constructed pipelines. WesTTex laid its pipeline completely within the preexisting
pipeline easements. The strip of land containing the WesTTex pipeline, and the three
preexisting pipelines, is adjacent to three additional pipelines; thus, there were six
preexisting pipelines in the vicinity where WesTTex laid its pipeline. The six
preexisting pipelines and the WesTTex pipeline lay between a highway and electrical
power lines. The Jenkses never made any efforts to segregate the portion of the
property where the six preexisting pipelines lay. The entire 735-acre tract, including
the land where the preexisting pipelines lay, had been used for agricultural purposes
for several decades. And, after the installation of the WesTTex pipeline, the surface
of the 5.47-acre pipeline easement continued to be used for agricultural purposes.
          The case proceeded to trial solely on the issue of the amount due the Jenkses
for the easement taking by WesTTex. Before trial, WesTTex filed motions to exclude
the testimony of the Jenkses two real-estate appraisal experts: Brad Kangieser and
Tom Edmonds. WesTTex attacked the reliability of both experts’ opinions regarding
(1) the fair market value of the easement acquired by WesTTex and (2) the value of
the right to assign the easement, which WesTTex also acquired. In particular, the
motions presented the following arguments challenging Kangieser’s and Edmonds’s
opinions as to the fair market value of the easement: (1) Kangieser and Edmonds did
not employ the judicially approved “before-and-after” valuation method; (2)
Kangieser and Edmonds improperly considered the WesTTex pipeline project; and
(3) Kangieser and Edmonds improperly assumed the highest and best use for the 5.47
acres subject to the WesTTex easement was a pipeline easement. WesTTex
challenged the experts’ opinions as to the value of the right to assign the easement on
the following grounds: (1) the right to assign the easement should not be valued
separately from the fair-market value of the easement, and (2) Kangieser and
Edmonds each relied on an unreliable valuation model in appraising the right to
assign the easement. 
          As evidence to support its motions, WesTTex attached the reports and
deposition testimony of Kangieser and Edmonds. In his deposition and report,
Kangieser opined that the fair-market value of the WesTTex easement was $109,837
and that the value of the right to assign the easement was $41,006. The total
compensation owing the Jenkses, according to Kangieser, was $150,843. Similarly,
Edmonds’s report and deposition showed that he believed that the fair-market value
of the easement was $131,805 and that the value of the right to assign the easement
was $22,831, totaling $154,636. 
          The trial court conducted a pre-trial hearing on WesTTex’s motions to exclude
Kangieser’s and Edmonds’s testimony, at which hearing counsel for the parties
presented oral argument. On the first day of trial, the trial court denied the motions
to exclude. Over the objections of WesTTex, Kangieser and Edmonds testified at
trial; each testified consistently with his deposition testimony offered in support of
the motions to exclude.
          WesTTex also offered the testimony of two real-estate appraisal experts: Albert
Allen and David Dominy. Allen and Dominy both opined that the highest and best
use for the condemned property was agricultural purposes. Applying the “before-and-after” approach to appraising the property, Dominy testified that the Jenkses were
entitled to $2,751 in compensation; Allen opined that $5,244 was the appropriate
amount, which was also the amount awarded by the special commissioners.
          The jury found that the fair-market value of the pipeline easement was
$154,636, the exact figure provided by Edmonds. After deducting the $5,244 that
WesTTex had previously deposited into the court registry, the trial court rendered
judgment awarding the Jenkses $149,392 plus pre- and post-judgment interest.
          In eight issues, WesTTex contends that the trial court erred in admitting the
testimony of Edmonds and Kangieser; complains that the trial court erred in denying
WesTTex’s post-verdict challenges requesting the trial court to disregard the jury’s
finding and enter judgment for $5,244; and challenges omissions from and inclusions
in the jury charge. 
Discussion
A.      Admissibility of Expert Testimony
          In issues one and two, WesTTex complains that the trial court erred in
admitting Kangieser’s and Edmonds’s opinion testimony as to the value of the
property taken. In support of these issues, WesTTex contends as follows: (1)
Kangieser and Edmonds impermissibly included project enhancement in their
valuations by relying on WesTTex’s condemnation to compute the easement’s
fair-market value; (2) Kangieser’s and Edmonds’s conclusion that the property’s
highest and best use was for a pipeline easement was flawed; (3) Kangieser and
Edmonds failed to use the “before-and-after” approach to valuing the easement; and
(4) Kangieser’s and Edmonds’s opinions as to the value of the right to assign the
easement were unreliable. 
          1.       Standards Applicable to Expert Opinion Evidence
          In Gammill v. Jack Williams Chevrolet, Inc., our supreme court held that all
expert testimony must be relevant and reliable under Rule of Evidence 702. 972
S.W.2d 713, 727 (Tex. 1998). This holding includes the testimony of expert appraisal
witnesses in condemnation actions. Guadalupe-Blanco River Auth. v. Kraft, 77
S.W.3d 805, 807 (Tex. 2002). Appraisal expertise is a form of “specialized
knowledge [used to] assist the trier of fact to determine a fact in issue.” Id. (quoting
Tex. R. Evid. 702). It is therefore subject to Gammill’s relevance and reliability
requirements. Kraft, 77 S.W.3d at 807. The proponent of expert testimony must
show that the opinions are both relevant to the issues and based upon a reliable
foundation. Id.; E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 556
(Tex. 1995) (adopting analysis of Daubert v. Merrell Dow Pharms., Inc., 509 U.S.
579, 589-90, 113 S. Ct. 2786, 2795 (1993)). The trial court must make the threshold
determination of whether the testimony meets both the relevancy and reliability
standards for admissibility under Rule 702. Robinson, 923 S.W.2d at 557. We
review the trial court’s decision to admit the testimony for an abuse of discretion. 
Kraft, 77 S.W.3d at 806. A court abuses its discretion when it acts without reference
to any guiding rules or principles. Robinson, 923 S.W.2d 549 at 558. Although the
trial court serves as an evidentiary gatekeeper by screening out irrelevant and
unreliable expert evidence, it has broad discretion to determine the admissibility of
that evidence. Id.
          The relevance requirement, which incorporates traditional relevancy analysis
under Rules of Evidence 401 and 402, is met if the expert testimony is “sufficiently
tied to the facts of the case that it will aid the jury in resolving a factual dispute.” Id.
at 556. Evidence that has no relationship to any issue in the case does not satisfy rule
702 and is thus inadmissible under rule 702, as well as under rules 401 and 402. Id.
          When the reliability of an expert’s testimony is challenged, the trial court must
“gauge” the expert’s reliability by ensuring “that the opinion comports with
applicable professional standards outside the courtroom.” Helena Chem. Co. v.
Wilkins, 47 S.W.3d 486, 499 (Tex. 2001) (quoting Gammill, 972 S.W.2d at 725-26). 
In applying this reliability standard, however, the trial court does not decide whether
the expert’s conclusions are correct; rather, the trial court determines whether the
analysis used to reach those conclusions is reliable. Gammill, 972 S.W.2d at 728. 
Expert testimony is also unreliable if there is too great an analytical gap between the
data upon which the expert relies and the opinion offered. Id. at 727. 
          2.       Exxon Pipeline Co. v. Zwahr: Standards for Valuing a Pipeline
Easement in Condemnation Cases
          Since the parties filed their principal briefs in this appeal, the Texas Supreme
Court issued its opinion in Exxon Pipeline Co. v. Zwahr, a case strikingly similar to
the present one. 88 S.W.3d 623 (Tex. 2002). Just as we must do, the Zwahr court
determined whether the trial court had abused its discretion in admitting the opinion
testimony of Brad Kangieser. As here, Kangieser testified in Zwahr regarding the fair
market value of a pipeline easement taken by condemnation. 
          In Zwahr, the supreme court restated the well-established legal standards
applicable to valuing a pipeline easement in a condemnation proceeding. In this
regard, the Zwahr court stated as follows:
Compensation for land taken by eminent domain is measured by the
fair-market value of the land at the time of the taking. The general rule
for determining fair-market value is the before-and-after rule, which
requires measuring the difference in the value of the land immediately
before and immediately after the taking. When, as here, only part of the
land is taken for an easement, a partial taking occurs. In this situation,
the before-and-after rule still applies, but compensation is measured by
the market value of the part taken plus any diminution in value to the
remainder of the land. 
 
In determining market value, the project-enhancement rule
provides that the factfinder may not consider any enhancement to the
value of the landowner’s property that results from the taking itself. 
This is because the objective of the judicial process in the condemnation
context is to make the landowner whole. To compensate a landowner
for value attributable to the condemnation project itself, however, would
place the landowner in a better position than he would have enjoyed had
there been no condemnation. . . .
 
On the other hand, the factfinder may consider the highest and
best use to which the land taken can be adapted. The existing use of the
land, . . . is its presumed highest and best use, but the landowner can
rebut this presumption by showing a reasonable probability that when
the taking occurred, the property was adaptable and needed or would
likely be needed in the near future for another use. 
 
Finally, Texas law permits landowners to introduce testimony that
the condemned land is a self-sufficient separate economic unit,
independent from the remainder of the parent tract with a different
highest and best use and different value from the remaining land. In this
situation, the market value of the severed land can be determined
without reference to the remaining land. But when the portion of the
land taken by eminent domain cannot be considered as a separate
economic unit, the before-and-after method requires determining market
value by evaluating the taken land as a proportionate part of the
remaining land. 

Id. at 627-28 (internal citations omitted).
          Applying these legal principles, the Zwahr court concluded that Kangieser’s
testimony was irrelevant, and therefore inadmissible, to determining the value of the
land taken from the Zwahrs; thus, the trial court had abused its discretion in admitting
Kangieser’s testimony. Id. at 631. The Zwahr court provided two reasons for its
holding: (1) Kangieser had impermissibly premised his valuation of the easement on
the fact of Exxon’s taking, in violation of the project-enhancement rule and (2)
Kangieser had failed to utilize the before-and-after method in valuing the easement. 
Id. at 630-31. 
          Of particular relevance to the Zwahr court was Kangieser’s testimony that
Exxon’s condemnation defined the parameters of the economic unit. Id. at 629-30. 
Kangieser testified that the 1.01-acre easement that Exxon acquired was a separate
economic unit that had a “highest and best use” as a pipeline easement. Id. at 626,
629. Kangieser stated that Exxon’s taking “created the economic unit.” Id. at 630. 
Similarly, here, Kangieser and Edmonds also utilized WesTTex’s condemnation to
define the parameters of the economic unit. Each testified in their respective
depositions that the 5.47-acre easement was a separate economic unit with a highest
and best use as a pipeline easement. In this regard, Kangieser testified that
“WesTTex created the economic unit that I valued.”


 More particularly, Kangieser
testified as follows:
Q:Did you determine that the 5.47 acres subject to the easement was
a separate economic unit?
 
A:Yes.
 
Q:And what did you look at or how did you arrive at that
determination?
 
A:Basically WesTTex has defined the parameters of the easement
that they’re taking, and I just valued what they had defined.
 
Q:Did you do any analysis or give any consideration to the fact that
the economic unit should be larger or smaller than what WesTTex
is acquiring?
 
A:No. I mean, the only thing that I can say is that we—that I’ve
looked at other easements in the marketplace and 50-foot wide
easements in the marketplace is not an uncommon width.
 
Q:Okay. So basically, as I understand your testimony, you relied on
WesTTex and its description of the easement rights it’s acquiring
to determine the economic unit that you valued.
 
. . . .
 
A:I was asked to value the 5.47-acre easement taking and that’s
what I did.
 
Q:If WesTTex had acquired a 30-foot easement rather than a 50-foot
easement, would you have considered the 60-foot easement to be 
the economic unit?
 
A:Yes.
Kangieser’s deposition testimony clearly demonstrates that his valuation of the
property taken by WesTTex was premised on the WesTTex project. 
          Likewise, Edmonds testified that he adopted the WesTTex pipeline easement
as his economic unit. He stated that the fact that a pipeline is being placed on the
5.47-acre strip of land is what makes it a separate economic unit. 
          As did the landowners in Zwahr, the Jenkses contend that Kangieser and
Edmonds based their respective highest-and-best-use opinions on the fact of the
preexisting pipeline easements in the vicinity of the WesTTex easement, not on the
WesTTex project itself.


 The record shows that in determining highest-and-best-use
for the 5.47 acres, both Kangieser and Edmonds testified that the preexisting
pipelines increased the likelihood of another pipeline’s being installed in that area. 
But we conclude, as did the Zwahr court, that such reliance on preexisting pipelines
does not refute the fact that WesTTex’s condemnation itself created the economic
unit used by both experts for determining highest and best use. See id. at 630. 
          In addition, as in Zwahr, the expert testimony here reveals that, besides relying
on the preexisting easements, Kangieser and Edmonds relied on the condemnation at
issue in determining not only the condemned property’s highest and best use, but also
its value. See id. When asked what factors he considered in determining the value
of the subject property, Edmonds stated that “you look at the rights that [the pipeline
company] is acquiring.” Edmonds’s also testified that the size of the pipeline being
installed and whether the particular easement is “exclusive” or “non-exclusive” are
factors in determining the value of the easement.


 As such, Edmonds’s testimony and
report make clear that the value that he assigned to the condemned property was tied
to the particular attributes of the condemnation project at issue. 
          Like Edmonds’s, Kangieser’s valuation opinion was affected by the WesTTex
condemnation project. Kangieser testified that the size of the pipeline being installed,
and whether the easement rights being acquired were exclusive or non-exclusive,
impacted the value that he assigned. Kangieser stated that, if WesTTex had been
installing a 14-inch pipeline, rather than a 12-3/4 inch pipeline,


 he would have given
the easement taking a higher value. 
          Kangieser’s and Edmonds’s appraisal reports also show that they relied on
project enhancement in valuing the taking. Both Kangieser and Edmonds used the
“sales comparison approach,” otherwise known as the “market approach,” in valuing
the condemned property. Using such approach, Kangieser and Edmonds arrived at
a fair-market value for the condemned property by evaluating and comparing the sales
of pipeline easements similar to the WesTTex easement. In this regard, Edmonds’s
appraisal report provided the following explanation for the method that he employed
in valuing the property: “The pipeline easement as though vacant was valued using
the sales comparison (market) approach. Sales involving pipeline easements
considered most comparable to the subject [WesTTex easement] were selected and
analyzed.” Similarly, Kangieser’s report stated the following with regard to
comparable sales that he used to value the condemned property: “The pipeline
easement sales listed on the previous pages were considered to be similar to the
subject [WesTTex easement] and a representative cross section of the sales
available.” The Jenkses’ experts premised their valuation opinion on the WesTTex
pipeline project by utilizing the sales of pipeline easements similar to the WesTTex
easement. 
          Because Kangieser and Edmonds relied on WesTTex’s condemnation in
establishing a separate economic unit and in assigning a value to that unit, their final
opinions reflected enhancement in the condemned property’s value that occurred only
because of the WesTTex project. Value that exists because of the condemnation
project is not, under the project-enhancement rule, value for which a landowner may
recover. Id. 
          After Kangieser and Edmonds determined that the 5.47-acre tract was a
separate economic unit, they each evaluated it without reference to the Jenkses’ entire
735-acre tract. Both experts provided a value for the condemned property as it
existed on August 28, 1998, the date of WesTTex’s taking. Neither expert
determined the value of the condemned property before or after the taking. As such,
Kangieser and Edmonds determined the value of the easement to WesTTex, not the
value of the loss to the Jenkses for the taking of the easement. See id. at 631. 
Kangieser failed to apply the before-and-after valuation method, which would have
required him to evaluate the condemned property as a proportionate part of the entire
735 acres.


 For these reasons, and applying the standards enunciated in Zwahr, we
conclude that Kangieser’s and Edmonds’s opinion testimony was irrelevant to
determining the value of the property taken by WesTTex; therefore, the testimony
was inadmissible under Rule of Evidence 702.


 See id. Accordingly, we hold that the
trial court abused its discretion in admitting the testimony. 
          We sustain WesTTex’s issues one and two.
B.      Denial of Post-Trial Motions
          In issues three and four, WesTTex complains that, because “no competent
evidence” exists to support the jury’s award, the trial court erred in denying its post-trial motions to disregard the jury’s damages finding and in refusing to modify the
judgment to award the Jenkses $5,244. 
          WesTTex filed a motion for judgment notwithstanding the verdict (JNOV) and
a motion to modify the judgment. Subject to the denial of those motions, WesTTex
also filed a motion for new trial. As in its motions to exclude, WesTTex argued in
its post-trial motions that the opinion testimony of Kangieser and Edmonds, as to the
fair-market value of the property taken, was inadmissible because the experts’
opinions were based on flawed methodology. On this basis, WesTTex asked the trial
court to disregard the jury’s finding as to the fair-market value of the condemned
property and to modify the judgment to award the Jenkses $5,244, the higher of the
two amounts provided by WesTTex’s valuation expert. The trial denied the post-trial
motions.
          Undeniably, the only evidence that tended to support the jury’s award of
$154,636 was Kangieser’s and Edmonds’s opinion testimony. As discussed above,
the testimony of the Jenkses’ two experts was inadmissible; thus, it constituted “no
evidence.” See Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.
1997). A trial court is allowed to render judgment notwithstanding the verdict and
to substitute its own judgment of the proper measure of damages only in certain
circumstances. State v. Huffstutler, 871 S.W.2d 955, 961 (Tex. App.—Austin 1994,
no writ). A JNOV is proper when a directed verdict would have been proper. Tex.
R. Civ. P. 301; Fort Bend County Drainage Dist. v. Sbrusch, 818 S.W.2d 392, 394
(Tex. 1991). A directed verdict is proper when the evidence conclusively proves a
fact that establishes a party’s right to judgment as a matter of law. Cliffs Drilling Co.
v. Burrows, 930 S.W.2d 709, 712 (Tex. App.—Houston [1st Dist.] 1996, no writ). 
Under the same rationale, a motion for JNOV should be granted when the evidence
is conclusive and one party is entitled to judgment as a matter of law. See Mancorp,
Inc. v. Culpepper, 802 S.W.2d 226, 227-28 (Tex. 1990). The evidence conclusively
establishes an issue when the evidence is such that there is no room for ordinary
minds to differ as to the conclusion to be drawn from the evidence. Triton Oil & Gas
Corp. v. Marine Contractors &Supply, Inc., 644 S.W.2d 443, 446 (Tex. 1982).
          The record reveals that the evidence presented at trial did not conclusively
establish that the Jenkses were entitled to judgment of $5,244, as WesTTex contends.
As previously mentioned, conflicting valuation testimony was presented by
WesTTex’s own appraisal experts. Dominy testified that the Jenkses were entitled
to $2,751; Allen opined that the fair-market value of the property was $5,244. 
Although WesTTex stated in its post-trial motions that it was agreeable to awarding
the Jenkses the higher of the two figures provided by its experts, it would have been
improper for the trial court to conclude, as a matter of law, that the fair-market value
of the condemned property was $5,244. See Huffstutler, 871 S.W.2d at 961. 
Accordingly, we cannot conclude that the trial court erred in denying WesTTex’s
motion for JNOV and in refusing to modify the judgment.
          We overrule issues three and four.




C.      Disposition of Appeal
          Although we have resolved all issues necessary to the disposition of this
appeal, we are still left to determine the correct appellate remedy. That is, should we
reverse and render or remand? We begin our analysis by holding that the admission
of Kangieser’s and Edmonds’s testimony as to the fair market value of the condemned
property was reversible error; it was the only evidence supporting the trial court’s
award of damages. See Tex. R. App. P. 44.1(a)(1). 
          As it did in the trial court, WesTTex requests this Court to reverse the trial
court’s judgment and render judgment awarding the Jenkses $5,244. Alternatively,
WesTTex requests us to remand for further proceedings. The rules of appellate
procedure provide that a reversal requires the rendering of a judgment unless a
remand is necessary for further proceedings. Tex. R. App. P. 43.3. In the context of
a case such as the instant one, we can render judgment only if there is no evidence to
support the award made and if the evidence conclusively establishes the amount of
the loss. Hill v. Spencer & Son, Inc., 973 S.W.2d 772, 776 (Tex. App.—Texarkana
1998, no pet.); Wegner v. State, 829 S.W.2d 922, 923 (Tex. App.—Tyler 1992, writ
denied). As discussed above, because WesTTex’s valuation experts presented
inconsistent evidence at trial, the evidence was not conclusive. We cannot conclude,
as a matter of law, that the higher figure given by WesTTex’s experts is the correct
damage award. See Wegner, 829 S.W.2d at 923; compare Hill, 973 S.W.2d at 773. 
Therefore, we cannot render judgment as requested by WesTTex. 
          This Court may suggest a remittitur on its own motion when the appellant
complains that there is insufficient evidence to support an award and the court of
appeals agrees, but finds that there is sufficient evidence to support a lesser award. 
See Tex. R. App. P. 46.3; see also Comstock Silversmiths, Inc. v. Carey, 894 S.W.2d
56, 57 (Tex. App.—San Antonio 1995, no writ); David McDavid Pontiac, Inc. v. Nix,
681 S.W.2d 831, 838-39 (Tex. App.—Dallas 1984, writ ref’d n.r.e.). Because we
conclude that sufficient evidence exists in the record to support an award of $5,244
for the property taken, we suggest a remittitur in that amount.
Conclusion
          We affirm the judgment of the trial court conditioned on the remittitur of
$5,244, representing the value of the property taken. See Tex. R. App. P. 46.3. If the
Jenkses file a remittitur of $5,244 with the Clerk of this Court by June 23, 2003, we
will reform the trial court’s judgment and, as reformed, affirm. See id. If the Clerk
of this Court does not receive the Jenkses’ remittitur by June 23, we will reverse and 

remand the trial court’s judgment for further proceedings. 
 
 
                                                             Laura Carter Higley
                                                             Justice

Panel consists of Justices Taft, Keyes, and Higley.