

## NUMBER 13-09-00462-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

**J.C. PENNEY CORPORATION, INC.,**
**D/B/A J.C. PENNEY STYLING SALON,**         **Appellant,**

**v.**

**YOLANDA GONZALEZ-ALANIZ,**         **Appellee.**

**On appeal from the County Court at Law No. 2**
**of Cameron County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Benavides and Vela**
**Memorandum Opinion by Justice Benavides**

By two issues, appellant J.C. Penney Corporation, Inc., d/b/a J.C. Penney Styling

Salon ("J.C. Penney") contends that: (1) the trial court abused its discretion when it

denied J.C. Penney's motion to exclude the testimony of appellee's expert witness, Nancy Heupel King; and (2) there was insufficient evidence at trial to support findings of negligence and damages against J.C. Penney.   We affirm.

## I. BACKGROUND

On May 6, 2005, appellee, Yolanda Gonzalez-Alaniz, traveled with her mother and children to the J.C. Penney Styling Salon in Harlingen, Texas, for a hair appointment.   Yolanda had been a regular customer of hairstylist Cyndia Robles Ybanez, who had worked at this salon since 2003.   At this appointment, Yolanda planned to have the roots of her hair lightened and her hair styled.

### A.    Yolanda's Testimony

At trial, Yolanda testified that she had to wait for her appointment to begin because her stylist, Cyndia, was running late.   When Cyndia finally arrived, she escorted Yolanda to her station and proceeded to the back of the salon to pour and mix the hair solution to lighten Yolanda's roots.   Yolanda testified that she had a history of sensitive scalp issues and that Cyndia knew, or should have known, about her hair condition given their mutual history.

Yolanda testified that she immediately started to feel a burning sensation when Cyndia applied the hair solution to her scalp.   According to Yolanda, when she informed Cyndia about the burning, Cyndia replied, "ah, don't worry, girl, it'll go away."   When Yolanda complained again, another J.C. Penney salon employee, Andy Gonzalez, told Yolanda that her scalp would "numb up" in five minutes.   Yolanda reported that her eyes

2

were watering and the inside of her nose started to burn. She continued to complain about a burning sensation and Cyndia handed her a magazine to get her "mind off of it."

According to Yolanda, at this point Andy asked Cyndia if she had reviewed Yolanda's "traveler" sheet before mixing the hair solution. J.C. Penney Styling Salon manager Celeste Ybanez established that a traveler sheet is a form generated by J.C. Penney that tracks a customer's salon history. It reports "the customer's name, the date they went by, what service they were getting done[,] and it's separated by certain sections, [such as] lab history [and] comments." All chemicals used during a session must be reported on the traveler sheet. Celeste explained that a stylist will write down what service they provided to the customer, what product they used, and how long they processed the customer's hair. The next day, a receptionist inputs the information into J.C. Penney's computer system.

Yolanda testified that Cyndia did not look at her traveler sheet before mixing her hair solution. Yolanda insisted that Cyndia rinse the solution from her scalp immediately. Cyndia took Yolanda to the sink but then allegedly applied more solution. At this point, Yolanda testified that she "took [Cyndia's] hands off and . . . said [']no, get it off 'cause it's really burning.['] I was in a lot of pain and my head was hurting me and pounding." Yolanda testified that Andy then approached with her traveler sheet and asked, "Did you put BioSilk on her?," to which Cyndia replied, "I didn't." As Cyndia washed the solution off her head, Yolanda recalled that she said, "[O]h, girl, I think I'm going to have to take you to the hospital," and "[d]on't worry, girl, I'll make it up to you."

3

Yolanda testified that she paid for her service but did not file an incident report because she was emotionally upset and just wanted to leave the salon. She also claimed that she did not want to get Cyndia into trouble. She remembered Andy saying, "make her sign a waiver" as she walked out of the salon.

In her lawsuit, Yolanda claimed that she suffered from blistering on her scalp, migraines, loss of appetite, and that her hair fell out where the solution had been applied. She did not seek medical treatment for two weeks because she "thought [her symptoms were] going to go away," and treated her blisters at home with Neosporin and took Tylenol for pain. She eventually visited Alison Garza, M.D., a primary care physician. Dr. Garza treated Yolanda for "small vesicular lesions" due to "an allergic reaction of the scalp secondary to hair coloring received on May 6, 2005." Dr. Garza's records indicated that she also noted that Yolanda's nostrils were "fiery red." Dr. Garza prescribed Rogaine for the hair loss. Two days later, when Yolanda called Dr. Garza complaining of continued headaches, Dr. Garza told her to go to the hospital. The E.R. doctor, according to hospital records, diagnosed Yolanda with chronic cephalgia and basogangleus lesions on her scalp. Yolanda subsequently visited a neurologist, Miguel A. Gutierrez, M.D., who diagnosed her with migraines. Dr. Gutierrez treated Yolanda's migraines with Topamax. Dr. Gutierrez later referred her to Stanley Fisher, M.D., a neurologist in Houston. Dr. Fisher opined that Yolanda suffered from generalized anxiety disorder.

4

**B.    Nancy Heupel King's Testimony**

King testified as Yolanda's expert witness. During trial, King stated that she regularly employed hairstylists, manicurists, and aestheticians as a salon owner in the state of Maryland for ten years. While a salon owner, she became involved with the Board of Cosmetologists in Maryland and was eventually appointed Chairman of the Board. King further testified that she has written laws and rules regarding cosmetology for all fifty states and has helped prepare some of the national exams that states offer for persons seeking cosmetology licenses. She was a cosmetology exam development and subject-matter expert for the Texas Department of Licensing and Regulations from 1998 until 2006. King is also a contributing author and editor of the *Milady Standard for Cosmetology*, which the most commonly-used textbook in cosmetology courses. She is not, however, a licensed cosmetologist in any state. She has licenses in Colorado, Arizona, and Maryland as a nail technician or manicurist.

King testified that salon owners are responsible for ensuring that their employees have valid licenses and that they work within the standards of practice for the scope of that license. She also stated that it is important for licensed cosmetologists to receive regular training and evaluations. She testified that "cosmetologists should know what harmful ingredients are in the products" they use, explaining that "that doesn't mean that they're expected to be a chemist, but they need to know which chemicals in what products need to be used . . . so that they are in fact safe." King also testified that it is crucial that employees know what material safety data sheets, or MSDS sheets, are.

5

According to King, cosmetologists working with chemicals "should have read the MSDS sheet for the product and they should be familiar with the safe use and handling and the potential hazards from that product's use or misuse." Cosmetologists should also know the difference between disinfection and sanitation. Sanitation, she explained, referred to cleaning the surface debris of cosmetology tools. Disinfection, on the other hand, dealt with the removal of bacteria and germs on tools.

King opined that salon employers should ensure that their employees know where the MSDS sheets are, should hire qualified employees, and should provide regular trainings and evaluations.

## C.     Cyndia's Testimony

Cyndia, the hairstylist who worked on Yolanda, graduated from the National Career Institute in Harlingen, Texas, in 1994. She testified that she is licensed as a cosmetologist in the State of Texas and began working for J.C. Penney in 1998.

During her trial testimony, Cyndia admitted that she did not know the meaning of the acronym MSDS when her deposition was taken, but that she did, in fact, know what material safety data sheets were. She explained that MSDS sheets contained information on "safety, the ingredients on hair products, what to do if the hair product is swallowed or if it falls in your eye, what procedures." Cyndia also admitted that she did not know the difference between sanitation and disinfection when asked about it during her deposition.

With regard to Yolanda, Cyndia testified that she did not know what chemicals or ingredients were in the hair solution applied to Yolanda's hair. In fact, Cyndia did not recall anything out of the ordinary when she treated Yolanda that day. She did not remember Yolanda's scalp blistering, swelling, turning red, or Yolanda making any usual statements about burning. She did, however, testify that she wrote "Alert: very sensitive" for Yolanda's traveler sheet after she did Yolanda's hair that day, and that it was rare for her to put "alerts" on her customers' files. She did not feel that the event with Yolanda warranted an incident report, though. During her direct examination, Cyndia also did not agree that a cosmetologist should know what harmful ingredients comprise hair products.

## D. Andres (Andy) Gonzalez's Testimony

Andy, a licensed barber, has worked at the J.C. Penney Salon for eighteen years. Andy explained that most permanent hair colors contain chemicals, such as ammonia or hydrogen peroxide, and that some clients are allergic or sensitive to these chemicals. In these situations, Andy explained that semi-permanent hair colors like BioSilk are used because they do not contain these chemicals and, thus, will not aggravate a client's scalp.

Andy had colored Yolanda's hair before in 2004, and recalled that she had a sensitive scalp: "She told me that she had problems with permanent color, that she was very sensitive, so that's when I started prescribing for her the semi-permanent color." Andy also said that he knew what MSDS sheets were: "that's the information that gives

7

you what to do in case one of your clients comes in contact with a chemical . . . those are always kept in the front desk where you have access to the information to see what needs to be done if you have that problem." Andy testified that he remembered when Yolanda came in May of 2005 and that her scalp was not red, swollen, or blistered after the solution was applied. He also did not remember her saying that the solution was burning. Finally, he denied that he asked Yolanda to sign a waiver before she left the salon on the day in question.

### E.    Melissa Garcia Villarreal's Testimony

Melissa was the receptionist at the J.C. Penney Styling Salon. She testified that, the day after Yolanda's salon appointment, she entered Cyndia's notes onto Yolanda's official "traveler" sheet on the J.C. Penney computer system. Melissa stated that Cyndia's note, which stated "Alert: Very sensitive, use 9A energy, 20 dry and 15 cool," was the first time in fourteen years she had ever seen the word "alert" used on a traveler sheet. She also testified that if she had seen or heard anything unusual on the day of Yolanda's appointment that she would have reported it.

A jury found for Yolanda and awarded her $20,362.00 in actual damages and $20,000.00 for her physical pain and mental anguish, for a total of $40,362.00. This appeal ensued.

## II. DISCUSSION

### A.    The Expert Testimony of Nancy Heupel King

By its first issue, J.C. Penney argues that the trial court should have excluded the

8

testimony of Yolanda's expert, Nancy Heupel King. The trial court denied J.C. Penney's *Daubert/Robinson* motion to strike King and allowed her to testify.

### 1. Standard of Review and Applicable Law

The standard of review to determine whether a trial court properly allowed King's expert testimony is the abuse of discretion standard. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 718-19 (Tex. 1998); *E.I. du Pont du Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles such that the ruling was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). A reviewing court cannot conclude that a trial court abused its discretion simply because the reviewing court would have ruled differently. *Loftin v. Martin*, 776 S.W.2d 145, 146 (Tex. 1989).

A person can be qualified as an expert based on their knowledge, skill, training, experience, or education. *Gammill*, 972 S.W.2d at 718; *see* TEX. R. EVID. 702. Experts can testify about scientific, technical, or other specialized subjects if the testimony would assist the trier of fact to understand the evidence or determining a fact issue. *Gammill*, 972 S.W.2d at 718; *see* TEX. R. EVID. 702.

### 2. Analysis

J.C. Penney filed a "Daubert/Robinson Objection to the Testimony of Plaintiff's Designated Expert Nancy King Heupel and Motion to Strike or Limit Testimony." In its motion, J.C. Penney first argued that King is a licensed manicurist and not a licensed

cosmetologist.   Thus, J.C. Penney argued that King did not have the knowledge, skill, training, or experience to testify about hair styling services, and specifically hair coloring. *Gammill*, 972 S.W.2d at 718; *Robinson*, 923 S.W.2d at 556; *see* TEX. R. EVID. 702. They asserted that "just as a medical doctor without experience and training in a specialized area of medicine cannot properly give opinion critical of a doctor in that area, Ms. Heupel, with no training or licensure in hair services[,] should not be permitted to give opinion on the provision of such licensed services." *See Broders v. Heise*, 924 S.W.2d 148 (Tex. 1996) (finding an emergency room physician was not qualified to opine about the standard of care provided by board-certified neurologists on a patient with a craniocerebral brain injury).

Counsel for Yolanda countered that King was offered as an expert in salon management and safety standards, not as an expert on hairstyling services.   At the hearing on the *Daubert/Robinson* motion, Yolanda's counsel stated that King would testify about "standards for a hair salon," which would include minimum requirements for training employees and safety measures.   King's credentials in cosmetology included her work as a salon owner, her years as a consultant writing laws and license examinations for various state boards of cosmetology (including Texas), and co-authoring and editing a standard textbook on cosmetology.

Our review of the record reveals that King discussed that salon employers should ensure that their employees know where the MSDS sheets are, hire qualified employees, and provide regular trainings and evaluations.   King also opined that

10

cosmetologists should work within the scope of their licenses, receive regular training and evaluations, know which chemicals and harmful ingredients are in the products they use on customers, and know where material safety data sheets are located. King's testimony did not appear to focus on the specifics of hairstyling or hair coloring, as J.C. Penney contends. Rather, it focused on the duties of an employer and her opinion that J.C. Penney breached its duty as a salon because Cyndia should have been trained to refer to the MSDS sheet when Yolanda complained about burning sensations on her scalp.

J.C. Penney also argued that King's "methodology" was flawed because she focused on issues that were not germane to the case, such as the fact that Cyndia did not know the difference between "sanitation" and "disinfection" when questioned about it during her deposition. This, J.C. Penney argued, created an "analytical gap" in King's testimony because King's opinion "relied largely upon alleged deficiencies of . . . [Cyndia's] knowledge and application of salon sanitation, disenfection [sic], and sterilization regulations . . . none of which have anything to do with the type of hair color being used or whether that hair color gave [Yolanda] an allergic reaction." We disagree with this characterization of King's testimony. Rather than creating an "analytical gap" in her expert opinion, as J.C. Penney argues, this testimony buttresses King's opinion that J.C. Penney hired an employee who may have lacked training in some basic cosmetology skills and knowledge.

In light of King's actual testimony, and the fact that J.C. Penney (not Cyndia) was the named defendant in this case, we cannot say that the trial court abused its discretion when it allowed King to testify. *See Downer*, 701 S.W.2d at 241-42. King's testimony focused on salon management and safety issues, not on hairstyling or hair coloring. We overrule this issue.

## B. Sufficiency of the Evidence

### 1. Standard of Review

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable fact finder could and disregard evidence contrary to the finding unless a reasonable fact finder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

In reviewing an appellant's factual sufficiency challenge to an adverse jury finding on which the other party had the burden of proof, we will consider all of the evidence in the record, both in support of and contrary to the finding. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We will set aside the district court's finding

only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Where there are disputed issues of fact, we give deference to the fact-finder as they are the "sole judges of credibility of the witnesses and the weight to be given to their testimony." *Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27, 28 (Tex. 1993).

### 2. Analysis

By its second issue, J.C. Penney argues that Yolanda failed to prove negligence or an award of damages by legally or factually sufficient evidence. With regard to negligence, Yolanda's testimony clearly differs from the testimony of J.C. Penney employees Cyndia, Andy, and Melissa. Yolanda testified that Cyndia was running late to her appointment and failed to review Yolanda's "traveler sheet" before she began to mix hair solution to lighten Yolanda's hair. The failure to review the traveler sheet is significant because this document details previous services and products used on the customer. In this case, the traveler sheet would have revealed that BioSilk, the semi-permanent solution, was the product typically used on Yolanda's hair because of her sensitive scalp. Despite the traveler sheet documentation and Cyndia's history with Yolanda as a long-time salon client, Cyndia failed to use the semi-permanent Biosilk solution. Instead, Cyndia used a permanent solution that contained ammonia and peroxide. A jury could have considered this oversight as evidence of negligence. Further, after Yolanda reported feeling a burning sensation on her scalp and her eyes began to water, the jury heard testimony that Cyndia responded, "ah, don't worry, girl, it'll

13

go away." They also heard that when Cyndia was rinsing Yolanda's hair, she said, "[O]h, girl, I think I'm going to have to take you to the hospital," and "Don't worry, girl, I'll make it up to you." A jury could have determined that a reasonable salon stylist would not have reacted in such a manner.

In contrast, we note that none of the J.C. Penney employees recalled this version of the events. Cyndia and Melissa vaguely recalled Yolanda on this day, and Andy recalled the day but stated that he did not remember Yolanda complaining about any burning and did not see her scalp red or blistered. However, it is within the province of the jury to settle conflicts among the evidence and the credibility of the witnesses, and the jury believed Yolanda's version of the events. *See Jaffe Aircraft Corp*, 867 S.W.2d at 28. We will not substitute our judgment for that of the jury's. Because there is more than a scintilla of evidence to support the jury's finding on negligence, we hold that the evidence was sufficient to support a negligence finding. *See King Ranch, Inc.*, 118 S.W.3d at 751.

With respect to damages, Yolanda pleaded and testified about suffering from blisters on her head, migraines, a loss of appetite, and hair loss. During trial, Yolanda's counsel also submitted medical records from Dr. Garza. Dr. Garza's records documented "small vesicular lesions" due to "an allergic reaction of the scalp secondary to hair coloring received on May 6, 2005" two weeks after her salon treatment; noted that Yolanda's nostrils were "fiery red"; and show that Rogaine was prescribed for hair loss. The record additionally revealed emergency room records where an emergency-room

14

physician diagnosed Yolanda with chronic cephalgia and basogangleus lesions on her scalp; records from neurologist Dr. Gutierrez who treated Yolanda's migraines with Topamax; and records from Dr. Fisher diagnosing Yolanda with generalized anxiety disorder. Although the record showed that Yolanda waited two weeks after her alleged exposure to the chemicals in the hair solution before seeking medical treatment, this again was a fact issue to be decided within the province of the jury. *See Jaffe Aircraft Corp*, 867 S.W.2d at 28. In light of Yolanda's testimony about her immediate injuries following her salon appointment and the medical records admitted into evidence, we hold that the jury's award of damages was supported by sufficient evidence. The finding of damages is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Cain,* 709 S.W.2d at 176. We overrule J.C. Penney's second issue.

### III. CONCLUSION

Because we have overruled both of J.C. Penney's issues, we affirm the judgment of the trial court.

_____
GINA M. BENAVIDES,
Justice

Delivered and filed the
26th day of May, 2011.

15