

NUMBER 13-10-00687-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ROBERT SCOTT HOWELL,                                              Appellant,

v.

SANDRA LILIANA HOWELL,                                            Appellee.

**On appeal from the 444th District Court
of Cameron County, Texas.**

# MEMORANDUM OPINION

**Before Justices Garza, Benavides and Perkes
Memorandum Opinion by Justice Benavides**

This is an appeal from a divorce and child-custody jury trial.    By eleven issues—

which we consolidate into five—appellant Robert Scott Howell contends that the trial

court erred by: (1) making an improper comment on the evidence; (2) overruling several

of his evidentiary objections; (3) overruling his expert challenge; and (4) overruling his motion for judgment notwithstanding the verdict on the issue of separate property values. He also contends that the cumulative effect of these errors prejudiced his right to a fair trial. We affirm.

## I. BACKGROUND

### A. The Marriage

Robert and Sandra Liliana Howell met in late 1999 in Bogota, Colombia through a matchmaking agency called Latin Mate. The agency provided a service to Americans who wanted to meet Latin Americans for dates and possible romances. Robert, a native-born American, utilized Latin Mate's services to meet Sandra, a native-born Colombian. After a few dates in Colombia with Sandra, Robert returned home to Rancho Viejo, Texas.

Less than a month after his return, Robert invited and paid for Sandra to fly to Texas. After she arrived, Sandra lived with Robert while they continued their courtship. The couple eventually married in December 2000. Prior to the wedding, Robert and Sandra executed and entered into a premarital agreement. The Howells have one child, B.H., who was born in March 2003.[1]

At trial, Robert testified substantially about his role as the family's provider. During the marriage, Robert was a self-employed chiropractor in Brownsville, who purportedly earned, at one point, more than $300,000 annually, while Sandra stayed at

---

[1] We will use initials to protect the child's identity. *See* TEX. R. APP. P. 9.1.

home. Robert testified that during the marriage, he paid for Sandra to attend English-language classes and hired a housekeeper and groundskeeper to help the family with house work, to take care of B.H., and to tend to the yard. Robert also testified that he helped Sandra and her family financially in Colombia, including the purchase of a condominium for Sandra's mother. Robert also mentioned that he and Sandra vacationed to several locations, including Europe, St. Thomas, and Colombia.

During the marriage, Sandra eventually became a United States citizen. Sandra did not dispute that Robert provided financially for the family, or that he was a loving father to B.H. Sandra presented evidence that at times, however, Robert was controlling and sometimes wanted to be left alone at the home. Sandra introduced into evidence a two-page list of chores, prepared by Robert, for her to complete. Some items on the list included making sure Robert's clothes were organized in his closet, putting together photo albums from various vacation trips, and making sure that no fattening foods were available in the house. Robert asserted that this list was prepared as part of an assignment during a marriage counseling session and that Sandra had prepared a similar list for him, but he could not find it. Sandra and Robert sought marriage counseling in 2005, but according to both of them, the marriage reached a tipping point after an incident at their home in early November 2006.

**B.** **November 4, 2006 Incident**

Sandra testified that on the morning of November 4, 2006, Robert left home to attend to some business at his chiropractic clinic. When he returned, Sandra stated that Robert's behavior was like that of "[another] person." Sandra said that she was

3

using the master bathroom with the door closed when Robert returned. While she was in the bathroom, Robert pounded on the door and demanded that she open it. When she complied, Sandra saw Robert holding B.H. in his arms and asked her if she had seen B.H. Sandra told Robert that B.H. was asleep when she last checked on him. At that point, Sandra testified that Robert placed B.H., who was crying, back into his room and closed the door. Sandra attempted to calm Robert down, but he told her that she was "going to get out of [his] life today."

Later that morning, Sandra testified that she found herself alone with Robert in the master bathroom with the door closed. Sandra testified that Robert then told her that she "[needed] to start to pay [him] the money [he] spent on [her] over the years." At that point, Sandra stated that Robert put his hands around her neck. She attempted to stop him, but failed. Once he removed his hands from her neck, Sandra said that Robert then grabbed her body and bent her over the bathroom counter. At that point, Robert began to spank Sandra "like a child." According to Sandra, when he stopped the spanking, he attempted to have anal sex with her, but Sandra refused and pushed him away. Robert then asked Sandra to leave the house, which shocked Sandra.

Sandra then went to B.H.'s room and stayed there while Robert took a shower in the master bathroom. In a panic, Sandra testified that she began to call her friends and acquaintances for help. One of Sandra's friends, Maria Pelly, advised her to call 9-1-1, which she did. Rancho Viejo police officers were subsequently dispatched to the home.

Robert did not dispute that he and Sandra argued on November 4, 2006. Robert testified that he returned home on the morning of November 4, 2006 to find B.H. alone

4

and crying. Robert stated that he was upset with Sandra for allowing B.H. to cry and be left alone. He denied, however, that he physically assaulted Sandra or attempted to have anal sex with her.

Rancho Viejo Police Officer Arturo Huerta testified that he arrived at the Howell residence the afternoon of November 4, 2006 to find Sandra and B.H. outside the home. Officer Huerta described Sandra as "shaken" and indicated that she was crying and very nervous. Officer Huerta entered the home to find Robert inside the home and just out of the shower. Robert told Officer Huerta that the couple fought earlier that day because Sandra was upset that Robert would not sign some immigration forms which would have allowed Sandra's mother to visit the United States. Officer Huerta placed Robert under arrest and charged him with assault.[2] At the home, police photographed Sandra and some prescription drug bottles found inside of the residence, all of which appeared to belong to Robert. Following his arrest, Robert and Sandra ceased living together, and B.H. continued to live with Sandra.

## C. Divorce Proceedings

On November 22, 2006, Sandra petitioned for divorce from Robert and requested a temporary restraining order and other temporary orders. Robert answered and filed a counter petition. In January 2007, the trial court entered temporary orders which appointed Sandra temporary sole managing conservator of B.H. and Robert as temporary possessory conservator. The temporary orders required Robert to pay $650

---

[2] According to testimony, this charge was dismissed for insufficient evidence.

per month in child support and $350 per month alimony directly to Sandra. The trial court further ordered a social study of B.H., Robert, and Sandra, and appointed licensed attorney Leticia Barguiarena as B.H.'s guardian ad litem. The trial court also ordered Robert to continue to pay, among other things, liabilities and expenses associated with the home in Rancho Viejo, cellular phone service for Sandra, and payments toward an Oldsmobile vehicle. Sandra was given exclusive use and possession of the home in Rancho Viejo as well as the Oldsmobile.

After more than three years after the original petition for divorce was filed, trial commenced in January 2010. Daniel Gomez, a social investigator stated that he met with Robert, Sandra, and B.H. at different times during the course of his court-ordered social study. Gomez said that he witnessed B.H.'s interaction with Robert during his evaluation and described it as "normal" and that it did not raise any "red flags" for him. Gomez described B.H. and Robert's relationship as a loving and caring one. Robert indicated to Gomez that he was concerned about Sandra's grasp of the English language and how it related to B.H.'s language ability but stated that Sandra was a good mother to B.H.[3] Gomez described B.H. and Sandra's relationship as very loving and indicated that Sandra's condominium, where she and B.H. lived at the time, was "excellent."[4] Sandra and Gomez also discussed the incident which took place on November 4, 2006. Sandra told Gomez that Robert would not allow B.H. to be

---

[3] B.H.'s kindergarten teacher, Laurie Oliveira, testified that B.H. was labeled a "gifted and talented" student and had no problems with the English language.

[4] The record indicates that the home in Rancho Viejo was eventually foreclosed upon during the pendency of the divorce proceedings due to Robert's failure to pay the mortgage.

vaccinated for diseases. Robert admitted in testimony that he believed that certain vaccinations were unnecessary and did not need to be given to B.H. In his report, Gomez recommended that (1) Robert seek a psychological evaluation, (2) Sandra be named sole managing conservator of B.H., and (3) Robert be granted regular visitations with B.H.

Barguiarena testified that early-on during her appointment, she wanted Sandra and Robert to be joint-managing conservators of B.H. According to Barguiarena, her opinion changed after a meeting where Robert and Sandra could not sit in the same room. Barguiarena described B.H.'s interactions with his father as "good," but not as "touchy feely" as B.H.'s interaction with his mother. Barguiarena stated that she thought that Gomez's recommendation for Robert to get a psychological evaluation was unfounded. Barguiarena observed that Sandra followed court orders, while Robert did not, such as discussing the divorce proceedings with B.H. According to Barguiarena, Robert appeared to put his own interests before B.H.'s. Barguiarena recommended that Sandra be appointed sole-managing conservator and that Robert be given possessory visitation.

Robert disputed both Gomez and Barguiarena's recommendations. Robert testified that Gomez and Barguiarena had an "agenda" against him. He insinuated in testimony that Gomez and Sandra may have had a romantic relationship and Barguiarena wanted Sandra to be sole-managing conservator because Barguiarena and Sandra shared the same gender and ethnicity.

7

Other witnesses testified at trial, including Ana Dolores Gomez, a psychotherapist[5] and licensed professional counselor with Bienestar Counseling Center. Gomez testified that she counseled B.H. from June 2008 until March 2009 and again in October 2009 and January 2010. Sandra brought B.H. to Gomez to help him adjust to the separation of his parents. During her sessions with B.H., she implemented play therapy.[6] At the start of B.H.'s therapy, Gomez testified that B.H. exhibited play themes of fear and anger due to the play's aggressive nature. As the sessions continued, Gomez noted that B.H.'s initial aggressive behavior lessened and his play would become "a lot more nurturing." B.H.'s initial aggressive-play behavior, according to Gomez, indicated trust issues and fear of "having to get the bad guy." Gomez opined that B.H. needed a home that is "encouraging," "stable," "consistent," where he is "encouraged to be a child," and can "feel safe."

Maria Pelly, Sandra's friend, also testified. Pelly recounted how she became acquainted with Sandra, described her involvement in the November 4, 2006 incident, and admitted that she had loaned approximately $5,000 to Sandra since her separation from Robert.

Barbara and Dennis Overton, Juan Carlos Rodriguez, and Norma Valladores each testified on Robert's behalf. Each of them was, at one point in time, Robert's former employee, but all considered him a friend and had personal knowledge of his

---

[5] Ana Dolores Gomez defined a "psychotherapist" as someone who "works with different populations" and "help[s] them through emotional or psychological problems."

[6] According to Gomez, play therapy is used for children who do not have the vocabulary that adults have to express themselves. Therefore, the children play with age-appropriate toys and the therapist will look for different themes in their play to allow the therapist to make an evaluation.

family life with Sandra and B.H. Barbara described Robert as a meticulous boss who cared about his employees and was a patient father to B.H. Dennis stated that he had no problems with Sandra and noted that Robert and B.H. did "normal things" as father and son. Rodriguez testified that Sandra called him on November 4, 2006 in tears and stated that an incident took place between Robert and her and that the police had arrested Robert. Rodriguez also described Robert as a "very caring father." Valladores testified that she had known Sandra and Robert since they were married. She described Robert and B.H.'s relationship as "normal."

After a ten-day trial, the jury found that: (1) grounds existed for divorce between Robert and Sandra; (2) Sandra should be appointed sole-managing conservator of B.H.; (3) Robert should be appointed possessory conservator of B.H.; (4) Sandra did not commit fraud or waste with respect to Robert's separate property; and (5) the value of each item of Robert's separate property listed in the charge was zero. Robert filed a motion for judgment notwithstanding the verdict with regard to the jury's fifth finding, which the trial court denied. On September 27, 2010, the trial court entered Sandra and Robert's final decree of divorce. The trial court filed findings of fact and conclusions of law on October 20, 2010. Robert's motion for new trial was overruled by operation of law on January 25, 2011, and this appeal ensued.[7]

## II. THE TRIAL COURT'S COMMENT

By his first issue, Robert asserts that the trial court fundamentally erred in

---

[7] On April 27, 2011, Sandra filed a motion with this Court to dismiss Robert's appeal for failure to prosecute. Robert filed a response on May 13, 2011. The motion was previously carried with the case, and today, it is hereby denied. *See* TEX. R. APP. P. 10.4.

commenting on the evidence that Sandra's counsel had "pretty well established" that Robert was a controlling individual.

## A.     Preservation of Error

A party must preserve error for appellate review to complain about a trial court's improper conduct or comment, unless the conduct or comment cannot be rendered harmless by proper instruction.   *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (citing *State v. Wilemon*, 393 S.W.2d 816, 818 (Tex. 1965)).   A party properly preserves error when the record shows that (1) a complaint was made to the trial court by timely request, objection, or motion that: (a) states the grounds for the ruling that the complaining party sought with sufficient specificity to make the trial court aware of the complaint; and (b) complies with the requirements of the Texas Rules of Evidence or Texas Rules of Civil or Appellate Procedure; and (2) the trial court: (a) ruled on the request, objection, or motion either expressly or implicitly; or (b) refused to rule on the request, objection, or motion and the complaining party objected to the refusal.   TEX. R. APP. P. 33.1.

## B.     Discussion

The crux of Robert's complaint relates to the trial court's comment during the following exchange, with emphasis added below:

[ROBERT'S COUNSEL]:   I guess at this point I want to object to the line of testimony.   I don't understand the relevance of going to the doctor and the dentist every six months.   I can't understand whether she's complaining about it or she's saying it's something good.   So I just don't understand

10

|  |  |
|---|---|
|  | the relevance. It doesn't make any event any more or less likely. |
| [SANDRA'S COUNSEL]: | Your Honor, basically I'm having [Sandra] show that [Robert] is basically a very controlling individual, that he is instructing her on the minutia of day-to-day living. |
| *TRIAL COURT:* | *I think you've pretty well established that. So let's move on.* |
| [SANDRA'S COUNSEL]: | Now, [Sandra], did you attempt to satisfy these requirements made by [Robert]? |

. . . .

The record shows that no objection was raised after the trial court made the complained-of remark and questioning by Sandra's counsel resumed. Despite the failure to preserve error, Robert argues that such judicial comments are "inappropriate" and violate Robert's fundamental due process rights, "vis-à-vis, his rights to be with and raise his child without undue governmental/court control and interference," and thus, we should still review his complaint because due process so requires. We decline the invitation. Unwaivable error must be of the type that "cannot be repaired" and therefore needs no objection. *See Gen. Motors Corp. v. Iracheta*, 161 S.W.3d 462, 472 (Tex. 2005) (finding unwaivable reversible error in a party's personal expression of gratitude to the jury at the close of the case). In an analogous criminal case, the court of criminal appeals held that error was not waived by a defendant who failed to object to a trial court's comments before the venire which tainted the defendant's presumption of innocence because such comments amounted to "fundamental error of constitutional

11

dimension." *Blue v. State*, 41 S.W.3d 129 (Tex. Crim. App. 2000) (en banc)

Here, Robert fails to explain *how* the trial court's off-hand comment violated his fundamental rights and could not be rendered harmless by a proper curative instruction. *See Francis*, 46 S.W.3d at 241; *Fed. Deposit Ins. Corp. v. White*, No. 13-08-00263-CV, 2011 WL 4998515, at *7 (Tex. App.—Corpus Christi Oct. 20, 2011, no pet.) (mem. op.). Accordingly, Robert's first issue is overruled.

## III.   EVIDENTIARY RULINGS

By his second issue, Robert contends that the trial court made several erroneous evidentiary rulings.

## A.   Standard of Review

A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *See In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). A trial court abuses its discretion if its decision is "arbitrary, unreasonable, and without reference to guiding rules and principles." *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997). If the appellant can show that the trial court's evidentiary ruling was erroneous, in order to show reversal, the complaining party must show that the error "probably (though not necessarily) resulted in improper judgment." *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995); *see* TEX. R. APP. P. 44.1.

We review the entire record to determine whether the complaining party made a successful challenge by showing that the judgment turns on the particular evidence excluded or admitted. *Nissan Motor Co.*, 145 S.W.3d at 144; *Alvarado*, 897 S.W.2d at

12

753. Determination of whether an erroneous admission is harmful is "more a matter of judgment than precise measurement." *Nissan Motor Co.*, 145 S.W.3d at 144. In making that judgment, a reviewing court should sometimes look to the efforts made by counsel to emphasize that erroneous evidence and whether there was contrary evidence that the improperly admitted evidence was calculated to overcome. *Id.*

## B.    Discussion

### 1. Text Message from Robert to Sandra

We disagree with Robert's first argument that the trial court erred under the best evidence rule when it allowed Sandra to read a text message into evidence during the following exchange at trial:

| | |
|---|---|
| Q. [BY SANDRA'S COUNSEL]: | Okay. How long did you stay at Maria Pelly's condominium? |
| A. [SANDRA]: | One week. Yes, one and a half weeks. |
| Q. | During that week and a half, did you have any contact with [Robert]? |
| A. | No, he sent to me e-mail—text message. |
| Q. | And what did this text message say? |
| A. | "This is the last opportunity you have"— |
| [ROBERT'S COUNSEL]: | Objection, best evidence. |
| TRIAL COURT: | I'm sorry? |
| [ROBERT'S COUNSEL]: | Best evidence. They can produce the document that has the text messages. |
| [SANDRA'S COUNSEL]: | Your Honor, there is no document when you have a text message. |

13

| | |
|---|---|
| [ROBERT'S COUNSEL]: | There absolutely is. It's all recorded. All you have to do is request it and bring it in. |
| TRIAL COURT: | Overruled. |
| Q. [BY SANDRA'S COUNSEL]: | What did the text message say? |
| A. | It says, "Your last opportunity to contact me. You are—if you don't, you are going to live like poor people who wait for the stamps, Medicaid. This is the life I don't want for my son. Contact me to my office now," text message. I didn't answer. I never answered these text messages. |

Generally, to prove the contents of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided by the rules of evidence or by law. *See* TEX. R. EVID. 1002. An original is not required, and other evidence of a writing is admissible, however, if the originals are: (1) lost or destroyed; (2) not obtainable; (3) outside the state; (4) in possession of the opponent; or (5) not closely related to a controlling issue. *See* TEX. R. EVID. 1004.

Here, Sandra's counsel represented to the trial court that a document of the text message was not obtainable. Robert's counsel argued in response that text messages were recorded but did not offer anything else to substantiate that argument. Accordingly, the trial court was within its discretion to determine that an original document of the text message sent to Sandra was unavailable.

Robert further contends that the contents of the text message were used to leave the jury with the impression that Robert "looks down his nose on people who are less

14

fortunate." Even assuming that Sandra's purpose in introducing the text message was for the purposes that Robert contends, it was nonetheless within the trial court's discretion to determine that the original text messages were not closely related to any controlling issue in the case—namely whether grounds for divorce existed and what were B.H.'s best interests—and thus, exempt from the best evidence rule and not erroneously admitted into evidence. *See id.*

### 2. Sandra's 9-1-1 Call Transcript

Next, Robert argues that the trial court abused its discretion by admitting a translated transcript of Sandra's November 4, 2006 9-1-1 call because it violated rule of evidence 1009(a).

Rule 1009(a) states the following:

> A translation of foreign language documents shall be admissible upon the affidavit of a qualified translator setting forth the qualifications of the translator and certifying that the translation is fair and accurate. Such affidavit, along with the translation and the underlying foreign language documents, shall be served upon all parties at least 45 days prior to the date of trial.

Robert claims that because the translation took place contemporaneously with trial and not at least 45 days prior to the date of trial, he was inadequately prepared for trial and objected to the contents of the phone call. However, Robert did not object to the translated transcript at trial. When Sandra moved to admit the translation, Robert's counsel twice expressed no objection to the English transcript, and it was accordingly admitted. Therefore, we conclude that Robert's argument under Rule 1009(a) is

15

waived.[8]   *See* TEX. R. APP. P. 33.1.

### 3. Prescription Pill Bottles

Robert next contends that the trial court abused its discretion by admitting prescription pill bottles belonging to Robert and the instructions that accompanied the pill bottles and by allowing Sandra to read the labels of the pill bottles over his relevance, authentication, and hearsay objections.

First, Robert argues that Sandra laid no predicate as to why the prescription pill bottles were relevant.   Relevant evidence is evidence that has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.   TEX. R. EVID. 401. The admission of the pill bottles followed a line of questioning by Robert's counsel to Sandra regarding a photograph of Robert's medications.   During cross-examination, Robert introduced, without objection, a photograph of several prescription bottles purportedly belonging to Robert that were found on November 4, 2006 when Rancho Viejo police arrived at the couple's home.   After this exchange, Robert's counsel elicited testimony from Sandra which appeared to explain circumstances such as stress and depression related to Robert's taking prescription medication.   Following this exchange, Sandra's counsel asked her on re-direct examination to identify the various prescription medication bottles found at the Howells' home and placed in plastic bags.   Robert's

---

[8] Robert was provided with a compact disc copy of Sandra's 9-1-1 call during the appropriate pretrial discovery phase. When considered in the entire record, this fact further weakens his argument to this Court that the contemporaneous translation did not allow him to adequately prepare for trial. Additionally, when Sandra moved to play the original November 4, 2007 audio in Spanish for the jury, Robert objected that the audio would be cumulative, which was also overruled.

objection to the relevance of Sandra's identification was overruled. Sandra's counsel specifically sought to introduce the pill bottles to rebut Robert's questioning on cross-examination as to whether the medications were current.

Therefore, in light of Robert's prior introduction of a photograph of the prescription medication, stipulation that the bottles were in the household on November 4, 2006, and Robert's prior questioning about the prescriptions and their uses, we conclude that the trial court did not abuse its discretion in admitting the actual prescription bottles over Robert's relevance and authentication objections. *See In re J.P.B.*, 180 S.W.3d at 575; Tex. R. Evid. 401; *cf State v. City of Greenville*, 726 S.W.2d 162, 168 (Tex. App.—Dallas 1986, writ ref'd n.r.e) (holding that a trial court did not abuse its discretion by admitting a photograph that depicted a prior verbal description which was admissible. "If a verbal description of the item is admissible, a photograph depicting it is also admissible.").

Next, Robert objected on hearsay grounds to the trial court's admission of a prescription information sheet from Walgreens for the drug Seroquel listed in Robert's name on hearsay grounds. Robert's counsel conceded at trial that Sandra had authenticated the information sheet, but continued to argue that allowing her to read from the sheet constituted hearsay. We agree. Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). Here, Sandra testified from the information sheet that Robert's prescription for Seroquel was used to treat "emotional or mood disorders, including schizophrenia" and "may also be used to treat other conditions as determined by the doctor." Sandra read from a document that she did not create,

17

and it was offered by her for the truth of the matter asserted—that is, reasons one would take Seroquel. Therefore, we conclude that the trial court abused its discretion in overruling Robert's hearsay objection on this evidence.

Having determined that the trial court's ruling was erroneous, we must now evaluate for harm by determining whether the preceding error "probably (though not necessarily) resulted in improper judgment." *Nissan Motor Co.*, 145 S.W.3d at 144; TEX. R. APP. P. 44.1. Robert argues that Sandra's testimony was "highly prejudicial" because documents which stated that he suffered from mood or emotional disorders was "damning without the proper expert context to put it into." We disagree. In this case, Robert's counsel's cross-examination of Sandra as well as Robert's own testimony opened the door to questions regarding Robert's mental health. Robert's attorney questioned Sandra about circumstances during November 4, 2006 that could possibly cause someone to be depressed, such as Robert's pending bankruptcy. Furthermore, Robert also admitted numerous times in testimony that he was depressed over financial matters. Because Robert, himself, raised issues with respect to his mental health, nothing in the record indicates that the erroneous admission of the Seroquel prescription information sheet and corresponding testimony probably resulted in improper judgment. *See Nissan Motor Co.*, 145 S.W.3d at 144.

### 4. *Photograph Testimony*

Robert's final argument focuses on the testimony of witness Isidro Cavazos. Over Robert's objections under evidentiary rules 403, 404(a), and 404(b), the trial court allowed Cavazos to testify that Robert once showed him photographs on his cell phone

18

of young girls he allegedly engaged in sex with. Cavazos opined that the girls in the photographs, including one depicted with Robert, appeared to be younger than eighteen. Rule 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. TEX. R. EVID. 403.

Robert argues that the admission of Cavazos's testimony served no legitimate purpose under rule 403 and should have been excluded.[9] We disagree. A trial court is given wide latitude to exclude or admit evidence under rule 403. *See Doe v. Mobile Video Tapes, Inc.*, 43 S.W.3d 40, 57 (Tex. App.—Corpus Christi 2001, no pet.). One issue before the jury in this case is B.H.'s best interests. While the substance of Cavazos's testimony was graphic, it was nonetheless relevant to the decision of B.H.'s best interest. The trial court's decision to admit this testimony based upon the ultimate issue of B.H.'s best interests was within its wide discretion. Furthermore, even assuming *arguendo* that the trial court abused its discretion in allowing Cavazos to testify, Robert does not argue how the error "resulted in improper judgment" based upon a review of the entire record. *See Nissan Motor Co.*, 145 S.W.3d at 144.

---

[9] Robert's briefing on this issue focuses almost exclusively on the trial court's 403 ruling. Robert inserted two sentences in his brief which state:

> Further, the court's overruling of Appellant's Texas Rule of Evidence 404(a) and 404(b) objections were erroneous. This testimony was meant [sic] character evidence and as alleged acts of other crimes, wrongs, or acts.

Without appropriate citation to authorities and to the record, we are unable to address Robert's 404(a) and 404(b) complaints. *See* TEX. R. APP. 38.1(i).

Robert's second issue is overruled.

## IV.     EXPERT CHALLENGE

By his third issue, Robert contends that the trial court erred by overruling his expert challenge to the play therapy testimony of licensed professional counselor Ana Dolores Gomez.

## A.     Applicable Law and Standard of Review

A witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.   TEX. R. EVID. 702.   The trial court serves as gatekeeper in determining whether proffered expert testimony meets the requirements of Rule 702.   *See* TEX. R. EVID. 104(a); *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995).   The trial court's role at this stage is to not determine the truth or falsity of the expert's opinion, but rather to make the initial determination whether the expert's opinion is relevant and whether the methods and research upon which it is based are reliable.   *Robinson*, 923 S.W.2d at 558.

In making a threshold determination of admissibility under Rule 702, the trial court may consider the following non-exhaustive list of factors:

> (1) the extent to which the theory has been or can be tested;
>
> (2) the extent to which the technique relies upon the subjective interpretation of the expert;
>
> (3) whether the theory has been subjected to peer review and/or publication;

20

(4) the technique's potential rate of error;

(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

(6) the non-judicial uses which have been made of the theory or technique

*Id.*

The burden to prove that the witness is qualified under Rule 702 rests with the offering party. *Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 718 (Tex. 1998). A trial court's acceptance of a witness's qualification as an expert is reviewable for an abuse of discretion. *Id.* at 718–19.

## B.  Discussion

Robert argues that the trial court abused its discretion by denying his expert challenge and by allowing Gomez to testify about her observations of B.H. during her play-therapy sessions.  We disagree.

Gomez testified that her educational background includes a master's degree in counseling from the University of Houston—Clear Lake and that she was a licensed professional counselor by the State of Texas and also a registered play therapist and supervisor.  In order to qualify as a registered play therapist and supervisor, Gomez stated that she was required to complete 150 hours of training in play therapy, attended North Texas State for a week of training, and also took classes under Dr. Gary Landreth and was supervised by Dr. Emily Owee.

Gomez testified that her therapy utilizes a "humanistic, child-centered play therapy" theory.  She testified that several studies show that play therapy is an effective

treatment for children and cited one study by Charles Schafer who found that "the primary treatment for children is play therapy" in hospitals, agencies, and mental health centers. Gomez testified that under humanistic, child-centered play therapy, children communicate through the play of the toys because the children do not have the verbal capacity to express themselves. Gomez admitted that there are other theories that may be used to make evaluations, but that these different theories were merely different ways of seeing the same problem.

Based on our review, we cannot conclude that the trial court abused its discretion as gatekeeper to admit Gomez's testimony under Rule 702 and the *Robinson* standard. *See* 923 S.W.2d at 556–58. Robert's third issue is overruled.

## V. J.N.O.V. ON VALUE OF PROPERTY

By his fourth issue, Robert contends that the jury's decision to award no value to Robert's separate property was against the great weight and preponderance of the evidence and the trial court erred in overruling his judgment notwithstanding the verdict on this issue.

In light of the jury's uncontested finding that Sandra did not commit fraud or waste with respect to Robert's separate property, we fail to find—and Robert does not articulate for this Court—how the jury's zero valuations amounted to reversible error in this case. *See* TEX. R. APP. P. 38.1(i); TEX. R. APP. P. 44.1(a). Accordingly, this issue is overruled. *See* TEX. R. APP. 47.1.

## VI. RIGHT TO A FAIR TRIAL

22

By his final issue, Robert argues that the cumulative effect of the trial court's errors, articulated by his issues on appeal, deprived him of a right to a fair trial under the United States and Texas Constitutions.

Because we concluded that the trial court committed only one error and that such error was harmless, we overrule this issue. *See* TEX. R. APP. P. 47.1.

## VII.    CONCLUSION

The trial court's judgment is affirmed.

_____
GINA M. BENAVIDES,
Justice

Delivered and filed the
28th day of February, 2013.

23